DAVID J. COHEN, ESQ.
California Bar No. 145748
ALEXANDER P. GUILMARTIN, ESQ.
California Bar No. 30676
**BAY AREA CRIMINAL LAWYERS, PC**
300 Montgomery Street, Suite 660
San Francisco, CA 94104
Telephone:  (415) 398-3900

Attorneys for Defendant **Matthew Worthing**

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br><br> Plaintiff, ) <br><br> v. ) <br><br> MATTHEW WORTHING, ) <br><br> Defendant. ) | Case No. 3:12-cr-00300-CRB <br><br> **MR.  WORTHING'S  SENTENCING MEMORANDUM** <br><br> Date:  April 26, 2018 <br> Time:  1:30 p.m. <br> Ctrm.: 6 |

**I.**

**INTRODUCTION**

On January 11, 2011, Matthew Worthing, at the age of 31 years old, was approached by agents from the Federal Bureau of Investigation in connection with the long-running property auction conduct of dozens of individuals in the Northern and Eastern Districts of California. Mr. Worthing immediately began his cooperation with the FBI, answering their questions truthfully and providing any limited information he had to offer. Pursuant to that cooperation and in an effort to do what he believed was right, on June 20, 2012, Mr. Worthing entered guilty pleas to all four counts of a four count information, all pursuant to a negotiated plea agreement. Doc. no. 9. Since that date, Mr. Worthing has awaited his sentencing while the government continued its prosecutions (and, in some cases, trials) of similar, related defendants.

Now, nearly six years after his plea, Mr. Worthing is before this Court for judgment. Mr. Worthing, who is nearing 40 and is no longer quite the young man he may have been at the time of his offense, stands before this Court as a loving husband, a dedicated father to two young children, an upstanding member of his community, and a changed person. He has at all times taken full responsibility for his participation in the conduct for which he was charged, and has lived with the regret of his involvement every day of the many years that have passed since. He will never be able to cast aside the felony conviction that will forever stand as the sole blemish on his otherwise impeccable record, and he will never be able to fully forgive himself for the pain, anguish, and unbearable stress this serious, federal criminal proceeding has placed on his family and closest friends. But it is also from those people that Mr. Worthing has found the strength to continue on as the man he knows himself to be, and he only hopes now that this Court will graciously grant him the opportunity to live his life outside the walls of a federal detention facility, where he can provide for, and continue to spend valuable time with, his loved ones.

United States Probation has recommended Mr. Worthing be sentenced to three years of probation. The community, and in particular Mr. Worthing's family, is better for Mr. Worthing's presence in and amongst it, and for that reason, he respectfully requests the Court adopt the recommendation of U.S. Probation and sentence Mr. Worthing to a probationary term. He submits for this Court's consideration the instant sentencing memorandum, as well as a personal letter, in his own words, attesting to his profound feelings about this case. *See* Exhibit A.

## II.

## MR. WORTHING'S BACKGROUND

It is impossible to reduce a man such as Mr. Worthing to a brief description of his attributes and characteristics. Nonetheless, this memorandum endeavors to try, in the most concise way possible.

Matthew Worthing was born on April 30, 1979 in Palo Alto, California, and has remained a member of the Bay Area community ever since. Throughout his life, Mr. Worthing has been led by two guiding principles: commitment to family and dedication to society. He has always been a

member of a close-knit family unit, maintaining positive relationships with his parents and loved ones and, indeed, working closely with them on a professional basis in his adult years. At the same time, he has been actively involved in community service since an early age, volunteering during his childhood and continuing into his adult life. Mr. Worthing recognizes the privileges and advantages he was provided as an adolescent, and strives to pass along some of those same blessings to the children for whom he continues to volunteer. Mr. Worthing also contributes generously to a number of charities, many focused on aiding disadvantaged youth. Many individuals have walked in shoes like Mr. Worthing's, but few have stopped to recognize the strength of the soles and endeavored to share those shoes with others less fortunate in the way that Mr. Worthing always has. Mr. Worthing is the rare man who consistently "walks the walk," earnestly contributing to charitable causes in which he truly believes. The beneficiaries of his activities are the disadvantaged in the community at large, and it is the fact that Mr. Worthing has been able to continue to operate as a vital member of that community that has allowed him to provide for others in a truly generous way.

As evident as Mr. Worthing's dedication to his community is, that commitment is dwarfed only by Mr. Worthing's tireless and unending devotion to his family. Mr. Worthing has always been a rock on which loved ones are able to lean, and the dozens of letters submitted to the Court on behalf of friends and family stand as a testament to the compassion Mr. Worthing has shown to every single person in his life. These letters, dozens in total, document the kind of man Mr. Worthing is on a daily basis, and the lengths he has gone to assist his friends and family when they have needed him most. The accounts in these letters speak to Mr. Worthing's honesty, integrity, and loyalty, and they make clear that the conduct Mr. Worthing has admitted is a surprising aberration born of inexperience and ignorance, not of malice or intentional duplicity.

The letters also reference Mr. Worthing's powerful relationship with his father, John Worthing. As this Court has witnessed, John Worthing has attended many of his son's court appearances and has stood by his side throughout every stage of this proceeding. He has done so because he has always maintained a close relationship with Matthew, and indeed, Matthew Worthing has benefitted from his father's knowing and compassionate guidance throughout his life. It is no

surprise that Mr. Worthing did not hesitate to join his father's business in 2010, where he worked for years, and continues to work, at the direction of two close paternal figures in John Worthing and Vincent Sakowski. These men have always trusted Matthew Worthing implicitly and without exception, and he too has relied upon their professional guidance in the development of his career.

Unfortunately, that same dedication to his father and his father's business is what ultimately led to Mr. Worthing's participation in the offense conduct at issue in this case. That history is described at length below. What should be noted, however, is that Mr. Worthing stands much differently situated than many of the related defendants before this Court. At the time of the suspect transactions in this matter, Mr. Worthing was not an experienced real estate businessman with knowledge of the trade and its procedures; rather, Mr. Worthing began participating in foreclosure auctions for his father's business only months before the first transaction with which he was charged. Approximately four months after that auction, Mr. Worthing was approached by the FBI, with which he immediately provided full cooperation.

Since that time, much has changed in Mr. Worthing's life. He is now happily married with two children, aged five and one. He is an important figure in his family's life, acting as sole provider and spending a great deal of time with his wife and children on a daily basis. Mr. Worthing is a kind, caring, and compassionate man, and nowhere is that more evident than in his interactions with his family. Professionally, too, Mr. Worthing has grown a great deal since the property transactions at issue. Having had an opportunity to learn the trade and the proper methods for handling real estate transactions, Mr. Worthing has been involved in many real estate transactions since his plea in 2012. This work has included his acquisition, financing, and renovation of thirteen different apartment buildings, each ranging in size from seven to 220 units and totaling over $100,000,000 in transactions. Mr. Worthing has also participated in the construction of two estates in Atherton, California that each sold for over $12,000,000. In the past two years specifically, Mr. Worthing has been working on a residential subdivision in Lafayette, California that is set to be put on the market soon. Every one of these transactions has resulted in satisfied investors, all of whom, in the interest of full disclosure, were fully informed of the nature of the charges against Mr. Worthing from the

outset of their dealing. Each transaction evidences Mr. Worthing's learned skills in the real estate field. What Mr. Worthing has developed over the past six years are skills and knowledge that he certainly did not possess at the time of the instant offenses. Mr. Worthing hopes and intends to continue his success in the real estate business, just as he hopes to use that success to provide for his family and continue his charitable contributions to the community.

### III.

### CASE HISTORY

**A.     Mr. Worthing's Auction Conduct**

In February of 2010, Mr. Worthing was inexperienced in the investment real estate industry but interested in becoming involved in and aiding his father's investment business. He was entrusted with the responsibility of attending foreclosure auctions in San Mateo and, occasionally, San Francisco Counties on behalf of Worthing Capital, generally with his father's business partner, Vincent Sakowski, conducting the actual business required at the auctions. These auctions, which usually involved foreclosed homes and took place on courthouse steps open to the public, were informal affairs frequented by recurring participants in the area. Without the benefit of inspections or cooling-off periods, interested bidders attempted to obtain foreclosed real estate from banks with little opportunity to research the properties and no guarantee of clear title.

Over the course of the next six months, Mr. Worthing would come to experience firsthand the cutthroat nature of the business and the difficulty which new participants had obtaining valuable properties. Acting at his father's direction and with the assistance (and physical presence) of Mr. Sakowski, Mr. Worthing placed (lawful) bids on numerous properties, only to be outbid by the same recurring participants. Unknowingly, Mr. Worthing was suffering the concerted actions of dozens of auction players with longstanding agreements for handling the foreclosure bidding process. This scheme appears to have been engineered by a group of five men, colloquially termed the "Big Five," who organized a bid-rigging procedure where they would control who obtained what properties and at what prices. Although the Big Five were unable to prevent outside participants from competing in auctions, they were successfully able to collaborate against outside participants to outbid them

and, in some extreme cases, to intimidate outside participants away from participation altogether. Regular participants were eventually faced with an uncomfortable choice: agree to the Big Five's terms and play by their rules, or effectively deny themselves any chance at acquiring property at the auctions. In at least one case, Mr. Worthing was actually outbid by a government informant himself, pursuant to the government's surreptitious efforts to extend the bid-rigging scheme and ensnare additional participants.

Naturally, Mr. Worthing, along with John Worthing and Mr. Sakowski, were frustrated by their inability to compete in the foreclosure auctions. On August 26, 2010, Mr. Worthing and Mr. Sakowski attended a foreclosure auction for a property located at 2307 Hacienda Street, San Mateo, California. Believing the property to be a good deal, Mr. Worthing began to bid at the auction in the hopes of obtaining it. To his surprise, he was stopped by Mr. Sakowski, who instructed him to stop bidding. Mr. Worthing complied, but confused by the direction, later spoke with Mr. Sakowski in order to ask him why they had abandoned the property. Mr. Sakowski explained that he had been approached by a competitor at the auction, Kevin Cullinane, who requested he refrain from bidding in exchange for $6,500. Mr. Sakowski accepted the offer, and Mr. Worthing was left with the misguided impression that agreements between auction participants were a customary, and necessary, means of doing business.

According to the government, over the course of the next four months, Mr. Worthing would participate in nine property transactions in which he accepted payments from or provided payments to other auction participants. These transactions included, exhaustively:

- 282 Holladay Ave., San Francisco, California (September 1, 2010) - The sole San Francisco County auction with which Mr. Worthing is charged, Mr. Worthing acknowledges receiving $3,000 from Mohammed Rezaian in exchange for his not bidding on the property.

- 1050 16th Ave., Redwood City, California (September 2, 2010) - Mr. Worthing and two other participants were interested in jointly acquiring this property. However, when Mohammed Rezaian demanded $7,500 in order to quell bids from competitors,

Mr. Worthing provided his share of the payoff ($2,500) in order to acquire a one-third interest in the property.

- 81 Highland Ave., San Carlos, CA (September 3, 2010) - While in attendance at the day's auctions, Mr. Worthing was approached by a government informant, Rajiv Gujral, who offered him $2,000 to refrain from bidding on the property. As Mr. Worthing had no intention of purchasing the property, Mr. Worthing accepted Mr. Gujral's offer. Mr. Gujral did not ultimately pay Mr. Worthing, but instead provided payment on a later date to Mr. Sakowski.

- 653 Skyline Dr., Daly City, California (September 17, 2010) - Raymond Grinsell offered Mr. Worthing $2,000 not to bid on this property. Mr. Worthing accepted the offer.

- 6 Santa Ana Ave., Daly City, California (October 1, 2010) - Mr. Worthing partnered with Rick Kaluza to obtain this property. Mr. Kaluza reached an agreement with Mohammed Rezaian to pay him and his co-conspirators (the members of the Big Five) $2,000 each. Mr. Sakowski made the $5,000 payment (Worthing Capital's half of the payoff amount) to Mr. Kaluza, who passed it along to Mr. Rezaian.

- 1147 Vernon Ter., San Mateo, California (November 29, 2010) - According to the government, Mr. Worthing was offered a $4,000 payoff not to bid on this property. Although Mr. Worthing does not recall ever receiving this payment, it is possible Mr. Sakowski received the payoff at a later date.

- 637 Foothill Dr., Pacifica, California (November 29, 2010) - According to the government, Mr. Worthing was offered a $2,500 payoff not to bid on this property. Mr. Worthing, however, does not recall having received any payoff in connection with this property.

- 231 Gateway Dr., Pacifica, California (December 6, 2010) - Mr. Worthing partnered with Rick Kaluza and his company, Rich Growth Fund L.P., to obtain this property. Rich Growth Fund took title in the property, and it was Mr. Kaluza who negotiated

a $10,000 payoff to Mohammed Rezaian and conducted the actual bidding. Mr. Worthing was not a part of the presale negotiations.

- 41 Portola Ave., Daly City, California (January 3, 2011) - According to the government, Mr. Worthing was offered $1,500 not to bid on this property. Mr. Worthing never received any payment, as the government's investigation went public shortly after the property was sold.

At all times, Mr. Worthing acted at the direction and behest, and with the express approval, of his senior partners (his father and Mr. Sakowski). Mr. Worthing's decisions were his own, and he takes full responsibility for them. But it is clear that Mr. Worthing only became involved in the conduct at issue in this case through his exposure to it by Mr. Sakowski, and that he acted only in accordance with his training and instruction. The nine transactions listed above all indicate that Mr. Worthing was never the individual who initiated the unlawful conduct, but rather, was always brought into a payoff agreement by another party (whether by a business partner's negotiations or a competitor's payoff offer).

In total, Mr. Worthing (either himself or through Mr. Sakowski) received $13,500 in payments in exchange for his not bidding on six properties. Mr. Worthing participated in the joint purchases of three properties, which in total resulted in $27,500 paid out to competitors (of which $12,500 was Mr. Worthing's share). These properties were purchased for a total of $1,158,350.[1]

It is currently unknown what loss, if any, any banks suffered from the artificially lowered bids on foreclosed properties, although it would be possible to determine such losses from assessments and valuations. One of the properties Mr. Worthing is charged with having purchased, for example, resulted in a profit to its purchasers (Worthing Capital and Rich Growth Fund) of only $7,100, indicating that the property could not have fetched a much larger bid, if any larger at all, absent any

---

[1]On the basis of these three properties, the government attributes a volume of commerce to Mr. Worthing of $917,987 (consisting of Mr. Worthing's one-third interest in 1050 16th Ave. and, for an unknown reason, the entire purchase prices for 6 Santa Ana Ave. and 231 Gateway Dr.). A more accurate calculation of the purchase price actually attributable to Mr. Worthing is his one-third interest in 1050 16th Ave. plus his one-half interests in the Santa Ana and Gateway properties (resulting in a volume of commerce of $507,387).

bid-rigging agreement. However, because neither the government nor the banks have conducted any such analysis, Mr. Worthing does not presently have the benefit of calculating accurate loss amounts. What is clear is that, because the transactions in which Mr. Worthing was involved were "deficit bids," no homeowners would have lost any money as a result of the bid-rigging alleged.

## B.    The Government's Investigation[2]

In or around October of 2009, two participants in Bay Area foreclosure auctions, Rajiv Gurjal and Ashton Gurjal, became FBI informants. They told the government of a long-running scheme, started and operated by the "Big Five," to collaborate on bids placed for properties at foreclosure auctions.[3] This information was bolstered by the assistance of Gajan Thia and Juan Diaz, who became informants in January and March of 2010, respectively. With the assistance of the informants, the FBI began to conduct covert surveillance of foreclosure auctions, beginning an investigation that would last for over a year. During this investigation, government informants were permitted and encouraged to partake in bid-rigging schemes, and indeed, it appears that the Gujral

---

[2]Because Mr. Worthing immediately cooperated with the FBI and entered guilty pleas, he does not have the benefit that trial defendants have of access to discovery regarding the government's investigation of this case. Herein, he provides the limited information he has been able to obtain from the documents he has been able to review.

[3]Although the activities of the Big Five predate Mr. Worthing's involvement by years, it does not appear these individuals were the first to conceive of such a plot. Indeed, it appears the type of bid-rigging scheme at issue in this case has existed for decades in various jurisdictions:

> The same scheme has existed for decades in California and elsewhere. A 1986 article in the San Diego Union described an identical bid rigging/"round robin" scheme in Los Angeles County. Susan Burkhardt, *FORECLOSURE KING; Peers Question Strategy*, San Diego Union-Tribune, July 13, 1986 (App. at AX 014). Similarly, testimony before the United States Senate Judiciary Committee revealed that the scheme employed in this case was being employed in a large number of communities throughout at least four different states. Senate Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights Hearing; "Cartel Prosecution: Stopping Price Fixers and Protecting Consumers," (November 14, 2013) (Testimony by William Baer, Assistant Attorney General, Antitrust Division, United States Department of Justice, Washington, D.C. and Ronald Hosko, Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation, Washington, D.C.) https://www.justice.gov/opa/speech/assistant-attorney-general-bill-baer-and-assistant-director-fbis-criminal-investigative and App. at AX 20-21).

2:11-cr-00511-WBS, doc. no. 551.

Mr. Worthing's Sentencing Memorandum
*U.S. v. Worthing*;
Case No. 3:12-cr-00300-CRB

brothers were permitted to retain the profits obtained from the transactions in which they were involved (providing a perverse incentive for the informants to expand the scope of the illegal conduct and ensnare new participants).

For reasons it has never been able to satisfactorily explain, the government began to conduct illegal, warrantless recordings of foreclosure auctions through the placement of stationary audio and video recording devices on courthouse steps. At the time it began its unlawful conduct, the government knew the identities of the Big Five, as well as many of the existing participants in the bid-rigging scheme. Nonetheless, the government began its stationary recordings in December of 2009 (before Mr. Worthing began to attend foreclosure auctions), and continued its recordings until September 15, 2010.

Over the course of its investigation, the government obtained a number of materials that served as evidence of the scheme it uncovered. In addition to the informant statements and recordings referenced above, the government also obtained the ledgers of Mr. Rezaian and Mr. Rosenbledt, informant agreements, informant debrief statements, and co-conspirator statements (including statements from some of the Big Five defendants, such as Mr. Rezaian and Mr. Rosenbledt).

## C.    The Prosecution

On January 11, 2011, the FBI contacted Mr. Worthing and discussed with him his employment at his father's company, Worthing Capital, where he worked with Mr. Sakowski. Mr. Worthing was entirely forthcoming in his interview with the FBI, explaining his involvement and all recollections he had regarding specific property transactions. On March 29, 2012, Mr. Worthing was one of the first individuals to make a proffer to the government, which he did through his attorney. The government also interviewed John Worthing and Mr. Sakowski, ultimately deciding to extend to them non-prosecution agreements that were entered into on April 2, 2012.

On April 26, 2012, the government filed its information against Matthew Worthing charging him with two counts of conspiracy to commit bid rigging (one each in San Mateo and San Francisco Counties) and two counts of conspiracy to commit mail fraud (same). Doc. no. 1. On June 20, 2012,

a signed plea agreement was filed with the Court (doc. no. 8), and Matthew Worthing appeared before the Court to plead guilty to the four counts from the information (*see* doc. no. 9). On July 16, 2012, Mr. Worthing appeared for a full debrief interview, in which he fully acknowledged his conduct and provided to the government as much information as he could recall regarding the auctions it was investigating. Because of his low-level status and limited involvement, Mr. Worthing was unable to provide any dramatic revelations regarding the participation of more major players in the bid-rigging scheme. However, Mr. Worthing provided the names of all individuals he worked with and gave as complete a timeline of events as he possibly could.

While Mr. Worthing has been awaiting sentencing, the government has continued its prosecutions out of both the Northern and Eastern Districts (all of which involve similar allegations of bid-rigging schemes and conduct by defendants to obtain either properties or pay-offs through private, secondary round-robin auctions), resulting in a number of continuances of Mr. Worthing's sentencing while proceedings for the other defendants continued. Although many defendants ultimately elected to enter guilty pleas (almost all of which occurred after Mr. Worthing's), a handful instead proceeded to trial. In many of the prosecutions, the government pursued charges for conspiracy to commit mail fraud, as they did against Mr. Worthing. However, on August 15, 2016, United States District Judge Hamilton of the Oakland branch for the Northern District of California ordered the mail fraud counts in the indictments of Mr. Galloway, Mr. Diaz, Mr. Gullory, and Mr. Joyce dismissed. *United States v. Galloway*, 2016 U.S. Dist. LEXIS 109639 (N.D. Cal. Aug. 15, 2016).  In her order, Judge Hamilton cited the fundamental structural deficiencies in the charges and ordered that the only appropriate remedy for the government's lacking pleading was dismissal.

Following Judge Hamilton's ruling, and in recognition thereof, the government acknowledged the infirmity in its mail fraud allegations, permitted every related defendant before this Court to withdraw their guilty pleas to the mail fraud counts, dismissed every mail fraud charge, and entered into a stipulated change of plea to an information charging only bid-rigging counts. *See* 3:13-cr-00587-CRB, doc. no. 40; 3:13-cr-00246-CRB, doc. no. 43; 3:12-cr-00785-CRB, doc. no. 49; 3:11-cr-00801-CRB, doc. no. 53; 3:13-cr-00804-CRB, doc. no. 34; 3:13-cr-00805-CRB, doc. no. 37;

3:13-cr-00069-CRB, doc. no. 40; 3:12-cr-00301-CRB, doc. no. 44; 3:13-cr-00388-CRB, doc. no. 39; 3:13-cr-00670-CRB, doc. no. 37; 3:11-cr-00795-CRB, doc. no. 73; 3:11-cr-00802-CRB, doc. no. 58; 3:11-cr-00798-CRB, doc. no. 55; 3:11-cr-00798-CRB, doc. no. 55; 3:11-cr-00800-CRB, doc. no. 54; 3:11-cr-00797-CRB, doc. no. 58; 3:11-cr-00796-CRB, doc. no. 61. Likewise, the government moved to dismiss the mail fraud charges against all five hold-out defendants, all of whom have since elected to plead guilty to bid-rigging counts alone. *See* 3:14-cr-00534-CRB, doc. nos. 178, 262, 264, 271, 275, 276. Although Mr. Worthing moved to withdraw his plea on a number of bases, including the impropriety of the mail fraud counts, his motion was denied. Doc. no. 100.

On February 13, 2018, United States Probation prepared a draft presentence investigation report, which it disclosed to the parties. On February 28, 2018, Mr. Worthing provided a number of objections to the report. On April 12, 2018, Probation produced its final report, noting one resolved objection to the factual circumstances underlying the restitution calculation.[4] Doc. no. 106. In its final report, Probation included a sentencing recommendation that describes the applicable "Guidelines Provisions" as "18 months to 24 months;" this is in error, as the Guidelines level agreed upon in the plea agreement is 12-18 months after a downward adjustment for acceptance of responsibility. As the presentence report accurately describes this Guidelines level elsewhere, this error appears to have been inadvertent.

Although constricted by the Guidelines range agreed to in the plea agreement, U.S. Probation made some notable findings, including that, "While a minimal role reduction was not applied to this case, the defendant's overall conduct was not as involved or egregious as other co-conspirators in the instant offense." *Id*. at 21. The presentence report describes in more detail:

> With regard to the facts of this case, and the defendant's history as relevant to 18 U.S.C. §3553(a)(1), the probation officer considered the defendant's low likelihood of recidivism, his consistent employment history, his success over a lengthy period of pretrial release, and his commitment to his family to be mitigating factors. The

---

[4]Although Probation incorporated a number of Mr. Worthing's objections into the report, it appears to have ignored entirely many of the objections he raised. Uncertain why this is the case, Mr. Worthing attaches as Exhibit B his February 28, 2018 letter objecting to the presentence report, and incorporates by reference his unresolved objections (numbered 2, 3, 4, 5, 6, 7, 10, 11, 12, 13, 19, 21, 22, 23, and 24).

defendant did not participate in as many auctions, did not coerce others into participating in the offense, and the loss amount attributed to him is substantially lower than the majority of the others involved in the offense.

*Ibid*.

U.S. Probation ultimately recommended a "non-custodial sentence of three years probation." *Ibid*. Probation additionally recommends, as a condition of probation, that Mr. Worthing have no involvement with the other defendants in this case. This condition, however, should not be imposed in light of the undue hardship this would likely cause Mr. Worthing, and the high chances of his inadvertent violation of such a condition. Mr. Worthing continues to operate in the real estate business, where he has had great success and has worked lawfully for the past seven years. Many of the related defendants in this matter also continue to work in the local investment real estate industry, and there is a high chance Mr. Worthing will run into those defendants on a professional basis throughout his career, even if he does not intend to do so. As the government has alleged no continuing criminal enterprise and all defendants have been able to contact one another for the past seven years without incident, Mr. Worthing objects to the imposition of a condition that will unnecessarily restrict his ability to work in his field and conduct business free of arbitrary constraints. Mr. Worthing has little interest in working on any professional level with the individuals who organized and engineered an illegal bid-rigging enterprise. However, he should not face a potential probation violation any time he, in a professional setting, runs into one of the dozens of individuals connected to this case.

## IV.

## THE §3553(a) FACTORS SUPPORT A DOWNWARD VARIANCE TO A PROBATIONARY SENTENCE.

In this case, Mr. Worthing and the government agreed in the plea agreement to a sentencing guidelines range of 13 for Counts 1 and 3 (violations of 15 U.S.C. §1) and 15 for Counts 2 and 4 (18 U.S.C. §1349). The government also agreed to make a motion for a downward adjustment of two levels for acceptance of responsibility, reducing those sentencing ranges to 11 (8 to 14 months) and 13 (12-18 months), respectively. In addition, the plea agreement indicates the possibility of a

government motion pursuant to U.S.S.G. §5K1.1 in light of Mr. Worthing's early and entirely forthcoming assistance and cooperation with the government in its investigation.[56]

However, in *United States v. Booker*, 543 U.S. 220, 244 (2005), the United States Supreme Court held that those provisions of the federal Sentencing Reform Act of 1984 that make the Guidelines mandatory, 18 U.S.C. §3553(b)(1), or which rely upon the Guidelines's mandatory nature, 18 U.S.C. §3742(e), were incompatible with the Sixth Amendment of the United States Constitution. *Booker*, 543 U.S. at 245. As a result, the Court severed and excised those provisions, effectively making the Guidelines advisory. 543 U.S. at 245. Thus, under *Booker*, sentencing courts must treat the Guidelines as just one of a number of sentencing factors in addition to those set forth in 18 U.S.C. 3553(a).

In determining an appropriate sentence for a criminal defendant convicted of a federal crime, it is incumbent on the district court to "impose a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a); *see also United States v. Rosales-Gonzales*, 801 F.3d 1177, 1184 (9th Cir. 2015) ["This provision [§ 3553(a)] . . . 'is a guidepost, an overarching principle that directs judges in the appropriate exercise of their sentencing discretion within the sentencing range authorized and consideration of factors prescribed by Congress.'"]. Section 3553(a) requires sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed to provide just punishment and protect the public, the sentencing range established for the offense, the need to avoid unwarranted sentencing disparities among

---

[5]The government has not informed Mr. Worthing of the precise reduction it will seek pursuant to its §5K1.1 motion. However, Mr. Worthing notes that similarly situated defendants (that is, early cooperators who were not asked to testify at trial) in Oakland have received requests for a 35-40% reduction from the low-end of the Guidelines range applicable to their sentence. Ultimately, it is the Court, and not the government, that determines the extent of any departure. *United States v. Udo*, 963 F.2d 1318, 1319 (9th Cir. 1992); *see also United States v. Livesay*, 525 F.3d 1081, 1091-92 (11th Cir. 2008) [compiling cases demonstrating the Court's control over the extent of a §5K1.1 departure].

[6]In the unlikely event that the government, angered by Mr. Worthing's pursuit of a number of motions over the past several months of his case, declines to file a §5K1.1 motion for improper reasons, the Court retains its ability to grant a downward variance on its own initiative. *United States v. Goroza*, 941 F.2d, 908 (9th Cir. 1991); *United States v. Mena*, 925 F.2d 354, 355 (9th Cir.1991); *Wade v. United States*, 504 U.S. 181, 184 (1992). Mr. Worthing anticipates that the government will make the same request it would have made had Mr. Worthing's mail fraud counts been dismissed as intended: a 35% reduction from the low end of the Guidelines range of 8-14 months (the range applicable to the bid-rigging counts), for a recommended sentence of 5 months. There is no just reason for the government to diverge from the requests it has made for other defendants, particularly as nothing in Mr. Worthing's plea agreement precluded him from moving to withdraw his plea.

defendants, and the need to provide restitution. The Court should calculate the appropriate advisory Guidelines range and then consider "the factors enumerated in 18 U.S.C. § 3553(a)" to reach a final determination of the appropriate sentence.[7] *Rosales-Gonzales*, 801 F.3d at 1180.

"No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. §3661. "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 480 (2011), citing *Wasman v. United States*, 468 U.S. 559, 564 (1984).

**A.      "Nature and Circumstances of the Offense"**

Mr. Worthing has pled guilty to bid-rigging violations of 15 U.S.C. §1. Unlike many of the fraudulent schemes for which this Court has undoubtedly sentenced defendants in the past, Mr. Worthing's crime is not one with clear victims or loss. Institutional lenders set minimum opening bids, acting as competitors themselves in the auctions at issue int his case. If one were to ask why, exactly, it is unlawful for real estate investors to agree to a bid on a foreclosed property beyond the minimum bid set by the bank, one might be posing a fair question indeed. In fact, it is not even clear that any defendants, Mr. Worthing included, knew precisely why any of their conduct would be illegal, or even that it was so at all. As the Eastern District Court recognized in a related case,

---

[7]The United States Sentencing Commission has explicitly recognized the value of non-custodial sentences as an option for courts to consider:

> Effective alternative sanctions are important options for federal, state, and local criminal justice systems.  For the appropriate offenders, alternatives to incarceration can provide a substitute for costly incarceration.  Ideally, alternatives also provide those offenders opportunities by diverting them from prison (or reducing time spent in prison) and into programs providing the life skills and treatment necessary to become law-abiding and productive members of society.

United States Sentencing Commission, "Alternative Sentences in the Federal Criminal Justice System", (January 2009) https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20090206_Alternatives.pdf.

---

""[t]his particular crime is somewhat unique in that it really does appear that most of the defendants didn't realize what they were doing was a crime." Doc. no. 560 (9/12/2016 TX), 77:22.

Mr. Worthing's is a case of deflated bids at foreclosure auctions. The "victims" are institutional lenders who had foreclosed on properties and were offering them up at public auctions with deficit bids. It is entirely unknown whether any of the lenders would have received any additional profits had no bid scheme existed, and it is certainly not the case that there is any evidence that any homeowners were impacted by the actions of the defendants in this bid-rigging scheme. The sentencing provisions applicable to §1, found at U.S.S.G. §2R1.1, were clearly not drafted with the sort of conduct in this case in mind, referring as they do to a volume of commerce calculated in accordance with "the volume of commerce done by the organization in the goods or services that were affected by the violation, or the largest contract on which the organization submitted a complementary bid in connection with the bid-rigging conspiracy." These Guidelines provisions appear to have been drafted in order to address loss to purchasers resulting from artificially constrained bids for contracts; they do not fit squarely with the "volume of commerce" that has been calculated in the instant cases, which stems from a totaling of the full purchase price of every home that was obtained following a collusive bid.

Mr. Worthing stands in stark contrast to the other defendants who are before this Court for sentencing. Unlike many defendants, Mr. Worthing was not involved in tens or hundreds of transactions, nor in millions of dollars of real estate. He did not solicit payoffs, engineer round-robin auctions, approach other participants, understand the overarching structure of the scheme, or continue his involvement for years. Rather, Mr. Worthing accepted six payoffs and, along with his business partners, contributed to three payoffs to competitors. He received $9,500 (the remaining $5,500 alleged by the government was never given to Mr. Worthing), and purchased $507,387 of property in three auctions. Even using the government's miscalculated numbers, Mr. Worthing is unique in his low level of financial involvement, standing out as one of only three defendants before this Court whose volume of commerce is less than $1,000,000. Only two defendants have smaller

volumes of commerce, and only two defendants were involved in the scheme for shorter periods of time.

Mr. Worthing is charged with two counts of bid-rigging for his participation in auctions in two counties (San Mateo and San Francisco). It is worth noting that Mr. Worthing's sole activity in San Francisco county stems from a single transaction on September 1, 2010, in which Mr. Worthing received $3,000 from Mr. Rezaian not to bid on 282 Holladay Ave. The fact that one of Mr. Worthing's nine transactions occurred outside of San Mateo is not a fair reason to differentiate him from any of the other related defendants before this Court. Several related defendants, for example, have also been charged with two counts of bid-rigging (e.g., 3:14-cr-00534-CRB-1, 3:14-cr-00534-CRB-4, 3:14-cr-00534-CRB-2). Perhaps more importantly, as Mr. Worthing has demonstrated in earlier filings to this Court, a number of defendants with activity in multiple counties were not charged with multiple counts; one example with which this Court is familiar, Kevin Cullinane (a member of the Big Five), was involved in dozens of transactions in both San Mateo and San Francisco Counties, and yet was charged with only one count of bid-rigging in San Mateo County. *See* 3:14-cr-00534-CRB-3, doc. no. 1.

What should be evident is that the whole story of Mr. Worthing's conduct, with all of the relevant and immediately probative context, is not evident from a review of the charges to which he pled, nor the plea agreement he signed. Mr. Worthing respectfully requests this Court carefully consider all of the factual circumstances he has presented to it, both in the current filing and in filings past.

1.   <u>Variance for Minimal Role</u>

Section 3B1.2(a) permits the application of a four-level downward adjustment for a defendant's "minimal" role in an offense.[8] Mr. Worthing is fairly characterized as a "minimal

---

[8]The Application Notes explain the considerations in determining whether a participant's involvement in an offense is minimal:

(i) the degree to which the defendant understood the scope and structure of the criminal activity;

(ii) the degree to which the defendant participated in planning or organizing the criminal

participant" in the broad, far-reaching scheme prosecuted in the dozens of cases that have been brought in the Northern and Eastern Districts. Notably, U.S. Probation agrees with such a characterization, acknowledging in the presentence report that, while no adjustment is indicated in the plea agreement, Mr. Worthing's "overall conduct was not as involved or egregious as other co-conspirators." This is likely because it is clear from the evidence in this case that Mr. Worthing was a low-level participant acting largely at others' direction and with very little personal benefit. He was involved in only nine transactions, only three of which involved purchases (all three of which also involved partnerships with other purchasers).

Mr. Worthing's involvement in the offense occurred as a result of a naive perception that the payoff agreements were standard operating procedure. He had no knowledge of the structure of the scheme nor whether the agreements were uncharacteristic for foreclosure auctions. Mr. Worthing was not an organizer, had no role in planning any element of the scheme, and only began his participation as a direct result of an employer's instructions (during the initial 2307 Hacienda Street transaction). Mr. Worthing can only fairly be said to have personally received $9,500 in payoffs dispersed over six transactions, and clearly participated not for purposes of direct financial compensation, but because he believed it was an expectation of his employment.

Notably, a four-level downward variance from level 11 (the level at which Mr. Worthing would currently stand were he not facing mail fraud charges), in recognition of Mr. Worthing's minimal role in the offense, would result in a Guidelines range of 0-6 months. Thus, this consideration alone, even without reflection upon the numerous other §3553(a) factors, supports the probationary sentence recommended in the presentence investigation report. This is no accident, as

---

activity;
(iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
(iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
(v) the degree to which the defendant stood to benefit from the criminal activity.

Mr. Worthing's Sentencing Memorandum
*U.S. v. Worthing*;
Case No. 3:12-cr-00300-CRB

the nature of Mr. Worthing's conduct in and of itself is supportive of the non-custodial sentence he has requested.

2.    Mr. Worthing's Mail Fraud Convictions Should Not Affect His Sentence.

There is another way in which Mr. Worthing differs from some of the other defendants before this Court: the mail fraud charges against him have not been dismissed. Of course, Judge Hamilton has already determined that the mail fraud counts as to each defendant were improperly charged, resulting in their outright dismissal by the Court in four cases *United States v. Galloway*, 2016 U.S. Dist. LEXIS 109639 (N.D. Cal. Aug. 15, 2016). Recognizing both the force of Judge Hamilton's ruling and the fundamental injustice that would result from only some defendants benefitting from it, the government created a scheme by which each defendant would have an opportunity to have the mail fraud counts against them dismissed.

Mr. Worthing did not partake in the government's plan, but instead moved to withdraw his plea in part on the basis of the illegality of the mail fraud counts. Mr. Worthing's motion was denied, and for that reason alone (that is, the exercise of his right to a motion to withdraw his plea), he now stands before this Court with additional counts not shared by many other defendants. However, the fact that his counts remain in effect does not mean they are lawful, and it certainly does not mean that Mr. Worthing's sentence should be increased as a result. It remains unclear why the government maintains that the mail fraud charges were inappropriate in many other cases, but not Mr. Worthing's; it is entirely clear that Mr. Worthing faces these mail fraud counts *only* because he moved to withdraw his plea, rather than simply accepted what he contends was an unlawful offer by the government and the Court.

The government has prosecuted this case as a bid-rigging scheme, and that is how it should be treated at sentencing. The government has never been able to provide a cogent theory underpinning mail fraud charges, resulting in Judge Hamilton's dismissal of those counts. But the government has also never alleged that the mail fraud charges are anything except entirely tangential to the core conduct at issue in this case. The fact that the Guidelines provisions applicable to mail fraud (found at U.S.S.G. §3D1.2(d)) are higher than those applicable to the bid-rigging counts should

not influence this Court's discretion at sentencing. And whether or not *any* defendants should receive elevated sentences as a result of the government's decision to bring mail fraud charges, it is clear that *Mr. Worthing specifically* should not be subjected to a higher sentence merely because he did not commit to the government's preferred procedural vehicle for dealing with the mail fraud charges. To sentence Mr. Worthing to a term of custody only because he moved to withdraw his plea on his own terms rather than the government's would be to subject Mr. Worthing to an arbitrary and capricious exercise of power.

Additionally, the Guidelines range of level 15 connected to the mail fraud convictions in the plea agreement is premised on an eight-level upward adjustment for loss. *See* §2B1.1(b)(1). However, despite the $96,500 loss amount reflected in the plea agreement, the government has submitted no materials indicating any loss to a bank or other entity, and has provided no discovery indicating any such loss occurred. In the absence of any evidence that a loss was suffered, Mr. Worthing should not receive an eight-level Guidelines adjustment under §2B1.1(b)(1)(E). Even if loss is instead calculated at an amount equal to the payoffs the government alleged Mr. Worthing received (setting aside the fact that Mr. Worthing believes a more appropriate calculation of this amount is $9,500, not $15,000), the Guidelines adjustment should be 2 levels, not 8. *See* §2B1.1(b)(1)(B). Consequently, separate and apart from the fact that Mr. Worthing should not have his sentence inflated due to his mail fraud convictions, those convictions themselves do not support a sentence in the range of 12-18 months, and a downward variance reflecting this fact is appropriate.

3.    The Government's Conduct

Mr. Worthing makes no excuses for his actions, for they are his alone. However, it is incumbent upon the defense to note for this Court the government's conduct that has undeniably contributed to Mr. Worthing being in the position in which he currently stands. Importantly, the government had all of the evidence it needed to proceed to a prosecution of the active participants long before Mr. Worthing was ever drawn into the bid-rigging scheme. With the full cooperation of its two key informants and pen registers on the Big Five, the government was free to bring charges and stop the illegal conduct from spreading farther. It did not do so, instead electing to permit the

informants to continue to perpetuate the scheme, bringing in new participants including Mr. Worthing. Mr. Worthing, it turns out, was not identified as a suspect until long after the government had obtained the information this very Court deemed sufficient to justify the prosecutions of Mr. Giraudo, *et al*. It is clear that were it not for the government's decision to actively assist in the prolongation of a bid-rigging scheme, Mr. Worthing would never have been approached by Mr. Rezaian or Mr. Gujral with offers of payoffs, and would never have become a criminal defendant in this case.

So too is it clear that the government's decision to engage in illegal audio and video surveillance affected every element of its investigation that followed. While the government engaged in illegal recordings "capturing the conversations of anyone who entered or exited the employee entrance of the courthouse [...] [r]egardless of whether that person was a defendant, a county employee, an attorney, a judge, or a member of the public" (*see* 3:14-cr-00534-CRB, doc. no. 150), Mr. Worthing only conducted his first transaction in September of 2010, long after the government had begun its unlawful seizure but long before the government was even aware of Mr. Worthing's identity.

In determining the punishment that is appropriate for what he has done, Mr. Worthing respectfully asks this Court pay heed to the government's own conduct, and the role it has played in ensnaring an otherwise law-abiding citizen. Mr. Worthing knows the blame for his behavior rests on him alone. But no man acts in a vacuum, free from external influences, and the government's influences in this case should not be ignored entirely.

**B.     "History and Characteristics of the Defendant"**

From the outset of the government's contacts with him, Mr. Worthing has acknowledged his wrongdoing and expressed sincere remorse for his involvement in this offense. This is evidenced not only by the fact that Mr. Worthing was one of the very first defendants to cooperate with the government and negotiate a plea agreement, but also by Mr. Worthing's own statements in his January 11, 2011 interview with the FBI; March 29, 2012 proffer; and July 16, 2012 debrief. Mr. Worthing has at all times admitted the nature of his conduct and has made no excuses for his own

decisions. While much of Mr. Worthing's behavior is attributable to his inexperience and reliance on instructions from his company, he has always taken full responsibility for his actions and repeatedly expressed his profound regret for his uncharacteristic involvement in unlawful conduct.

The reason for Mr. Worthing's immense remorse is not that he fears the consequences of his actions; he has lived for years with the knowledge that he has done wrong, and he knows that repercussions are appropriate. Rather, Mr. Worthing's regret stems from his awareness that his involvement in an illicit bid-rigging scheme is extremely far afield from all of his other behavior throughout his life. The conduct for which Mr. Worthing now stands judgment is an utter aberration, now just as much as it was at the time it was committed. Mr. Worthing's long history of honest, law-abiding actions was briefly derailed by his participation in the instant offense, and he has every intention of ensuring that no such derailment ever occurs again. The more than seven years that have passed since his participation in illegal foreclosure auctions are a testament to his dedication to the pursuit of a straight-and-narrow life. Mr. Worthing will live forever with the shame of his conduct, and seeks from this Court an understanding that the harshest judge of Mr. Worthing will always be Mr. Worthing himself.

Attached to this memorandum as Exhibit C are a collection of dozens of letters from friends and family that speak to the kind, generous, honest, loyal, and integrous person Mr. Worthing is. The man described in these accounts is one who has done, and undoubtedly will continue to do, great good for his community. Mr. Worthing has no criminal history, and will never accumulate any beyond the instant matter. He has erred gravely in connection to this case, and that cannot be ignored. But this Court also cannot ignore the true virtue of the man who stands before it in judgment. The attributes most fundamental to defining who Mr. Worthing is are the same attributes that support a downward variance to a probationary sentence.

**C.**    **"Need for the Sentence Imposed to" Provide Just Punishment and Protect the Public**

Although immensely difficult to consider in any objective sense, §3553(a)(2) requires the Court consider the seriousness of Mr. Worthing's offense, the punishment that is just, and the need

for the sentence to deter criminal conduct and protect the public from any such conduct. These considerations do not compel a custodial sentence here.

Mr. Worthing poses no threat to the public. To the contrary, he is a boon to the community, and the community is better for his presence therein. Over the more than seven years this case has been pending, Mr. Worthing has been a caring husband and father who has regularly made charitable contributions, attended every one of his court appearances, and abided fully by the law. Absolute specific deterrence was accomplished the moment Mr. Worthing was contacted by the FBI and informed of the illegality of his conduct; general deterrence has been achieved through the government's massive, public prosecution of dozens of participants throughout the state, as well as the serious prison sentences that have been handed down to the ringleaders of the operation. Since the date of his initial FBI interview in 2011, Mr. Worthing has at all times acted with deliberate caution, ensuring that his professional dealings are always in full compliance with the applicable rules and regulations. There is no danger Mr. Worthing will commit any such offense in the future, and the single most profound reason for that is that Mr. Worthing would never allow such a thing to occur.

The Worthing family is an upstanding one, and Mr. Worthing knows he has brought a great deal of pain and disgrace to his family name. He is unlikely to ever forgive himself for his mistakes, just as his father is unlikely to ever forgive himself for inviting the circumstances that led to this prosecution. Mr. Worthing has experienced the full force of public humiliation that accompanies federal charges, and has spent thousands of dollars on legal representation to ensure the case proceeded lawfully and properly. The collateral consequences of Mr. Worthing's conviction cannot be understated. Incarcerating Mr. Worthing for any period of time is not "just punishment," but rather, would be unnecessary retribution enacted by the United States.

Mr. Worthing is a good man who made a mistake, one he will never make again. The stress, anxiety, torment, and pain he has endured over the extended length of the prosecution (which has gone on for over seven long years as a result of the government's interest in resolving all cases simultaneously) cannot satisfactorily be put to words, but it is a punishment of immense magnitude

for a man in Mr. Worthing's position. Section 3553(a)(2) does not require Mr. Worthing be sentenced to a prison sentence. Rather, it supports Mr. Worthing's request for a three-year probationary term, during which the government may continue to monitor Mr. Worthing just as it has over the past seven years and witness his continued development as an upstanding member of the community.

**D.**    **"The Need to Avoid Unwarranted Sentencing Disparities Among Defendants"**

A critical consideration in a case like this, with dozens of related defendants, including many who have already been sentenced in neighboring jurisdictions, is a factor explicitly referenced in §3553(a): "the need to avoid unwarranted sentencing disparities." Here, many defendants have received probationary terms, and those who have been subjected to custodial sentences have also faced extenuating circumstances that set them apart from the other defendants. Mr. Worthing, for his part, has one of the lowest volumes of commerce of *any* defendant, the shortest lengths of participation in the scheme, the lowest numbers of transactions in which he was involved, the least amounts of financial gain from his participation, and the lowest levels of discretion in any decision-making processes. Because of this, Mr. Worthing should be subjected to a *lower* sentence than many other defendants, and certainly he should not be subjected to a custodial prison sentence of the sort that has been reserved for uniquely serious offenders.

Mr. Worthing notes that, even though this Court has not yet sentenced any of the defendants before it, many related and similar defendants facing like prosecutions out of the Northern and Eastern Districts have already received probationary sentences, despite many of them having had far greater involvement in the bid-rigging scheme and a much larger number of transactions with which they were connected. Mr. Worthing lists many of them below:

- Robert Kramer, despite two bid-rigging counts and a volume of commerce exceeding $12,000,000 (4:11-cr-00423-PJH-1)

- Garry Wan, plus a minor role adjustment, despite a volume of commerce exceeding $10,000,000 (4:14-cr-00604-PJH-1)

- Peter McDonough, despite a volume of commerce exceeding $9,000,000 (4:13-cr-00144-PJH-1)

- Gernot Zepernick, plus a minor role adjustment, despite a volume of commerce exceeding $6,000,000 (4:14-cr-00512-PJH-1)

- Douglas Moore, despite two bid-rigging counts and a volume of commerce exceeding $6,000,000 (4:11-cr-00431-PJH-1)

- Rudolph Silva, despite an obstruction enhancement and a volume of commerce exceeding $4,000,000 (4:14-cr-00002-PJH-1)

- Charles Gonzales, despite being one of the last defendants to plead and a volume of commerce exceeding $3,000,000 (4:14-cr-00099-PJH-1)

- Hilton Wong, despite a volume of commerce exceeding $2,000,000 (4:12-cr-00082-PJH-1)

- Jaime Wong (4:11-cr-00427-PJH-1)

- Stan Kahan (4:13-cr-00412-PJH-1)

- Irma Galvez, plus a minor role adjustment (4:13-cr-00414-PJH-1)

- Eric Larsen, plus a minor role adjustment (4:11-cr-00723-PJH-1)

- Thomas Legault (4:11-cr-00429-PJH-1)

- Thomas Franciose (4:11-cr-00426-PJH-1)

- Grant Alvernaz, despite two bid-rigging counts and a volume of commerce exceeding $6,000,000 (4:11-cr-00432-PJH-1)

- David Margen, despite two bid-rigging counts and a volume of commerce exceeding $6,000,000 (4:11-cr-00425-PJH-1)

- Michael Renquist, despite two bid-rigging counts and a volume of commerce exceeding $5,000,000 (4:13-cr-00143-PJH-1)

- Wesley Barta, despite a volume of commerce exceeding $5,000,000 (4:13-cr-00413-PJH-1)

- John Shiells, despite three bid-rigging counts and a volume of commerce exceeding $5,000,000 (4:14-cr-00581-PJH-1)

- Douglas Ditmer, despite two bid-rigging counts and a volume of commerce exceeding $2,000,000 (4:12-cr-00448-PJH-1)

- Miguel De Sanz, despite three bid-rigging counts and a volume of commerce exceeding $2,000,000 (4:14-cr-00581-PJH-2)

- Joseph Vesce, despite a volume of commerce exceeding $2,000,000 (4:13-cr-00415-PJH-1)

- Dominic Leung, despite a volume of commerce exceeding $2,000,000 (4:12-cr-00083-PJH-1)

- • Timothy Powers, despite a volume of commerce totaling $2,000,000 (4:11-cr-00722-PJH-1)

- • Charles Rock (4:14-cr-00607-PJH)

- • Jorge Wong, plus a minor role adjustment (4:11-cr-00428-PJH-1)

- • Keith Slipper, despite two bid-rigging counts (4:12-cr-00447-PJH-1)

- • Danli Liu (4:12-cr-00611-PJH-1)

- • Thomas Bishop (4:14-cr-00001-PJH-1)

- • Chuokee Bo (4:13-cr-00730-PJH-1)

- • Robert Rose, despite a volume of commerce exceeding $1,000,000 (2:11-cr-00292-WBS)

- • Gregory Jackson (2:11-cr-00090-WBS)

None of the defendants in Oakland to have received a custodial sentence are comparable to Mr. Worthing. All of them either had higher criminal history categories (e.g., 4:14-cr-00607-PJH, 4:15-cr-00339-PJH-1), higher Guidelines ranges (e.g., 4:14-cr-00582-JD-3, 4:14-cr-00607-PJH-4, 4:14-cr-00607-PJH), or additional charges (e.g., 4:14-cr-00003-PJH-1, 4:14-cr-00582-PJH-5).[9] Likewise, the lowest volume of commerce to receive a prison sentence in Sacramento was $6,636,331 (2:10-cr-00238-WBS), over seven times as high as Mr. Worthing's.

Of all the defendants who have been sentenced thus far, the one most similar to Mr. Worthing is Thomas Legault (4:11-cr-00429-PJH-1). Over the course of a year, Mr. Legault was involved in six transactions, with a volume of commerce of totaling $754,605. 4:11-cr-00429-PJH-1, doc. no. 48. Mr. Legault cooperated with the government from early on, resulting in a §5K1.1 motion and a request from the government for a 35% reduction in his sentencing range. *Ibid*. Unlike Mr. Worthing, Mr. Legault worked for, and conducted the illegal activity, for himself, and not at an employer's direction. Nevertheless, Mr. Legault was ultimately sentenced to a non-custodial probationary term. 4:11-cr-00429-PJH-1, doc. no. 53.

---

[9] Only one defendant for whom the government made a §5K1.1 motion received a prison sentence, and in that case, the defendant's criminal history category was 5 and his Guidelines range was 33-41 months; the defendant received a sentence of 14 months. 4:11-cr-00424-PJH-1.

Mr. Worthing's involvement might be said to mirror that of five other defendants in the Oakland prosecution, all of whom received probationary sentences due in part to the fact that they acted at another person's behest: Garry Wan, Gernot Zepernick, Irma Galvez, Eric Larsen, Jorge Wong. Indeed, all of these defendants, each of whom attended auctions and participated in the bid-rigging practices on behalf of their employers' companies, received minor role adjustments in recognition of the fact that they operated at the direction of other, more experienced participants.

Mr. Worthing also notes that, of the defendants currently before this Court for sentencing, one, James Appenrodt (3:14-cr-00534-CRB-4), has already received a minor role adjustment. Mr. Appenrodt received this benefit in recognition of the fact that he acted "only at the direction of Mr. Giraudo" (3:14-cr-00534-CRB-4, doc. no. 302, 5:24), despite his two bid-rigging convictions and his volume of commerce being more than twice that of Mr. Worthing's. Like Mr. Appenrodt, Mr. Worthing also began attending auctions with no knowledge of the bid-rigging conspiracy that long predated his involvement, and was brought into a scheme much bigger than himself.

On the date of sentencing, Mr. Worthing anticipates he will be before this Court alongside many of the other related defendants, and he anticipates this Court will wisely choose a sentence tethered to the dispositions reached in each other case. But Mr. Worthing also asks this Court reflect upon the sentences that have already been delivered to this point, and that it not subject him to a sentence more punishing than that which has already been imposed on defendants with higher levels of culpability and greater amounts of loss.

## E.     "The Need to Provide Restitution"

In his plea agreement, Mr. Worthing agreed to $15,000 in restitution. Mr. Worthing guarantees this Court he will make full and prompt restitution, and regardless of whether the amount in the plea agreement was properly calculated, Mr. Worthing is ready and willing to provide the payment he has agreed to make.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## V.

## CONCLUSION

Matthew Worthing is a man of integrity and conviction, one who, no matter what this Court elects to do at sentencing, will live the rest of the life with the shame of a dark blemish on his otherwise unimpeachable record. The letter Mr. Worthing has written to this Court on his behalf indicates something that is clear from even a brief conversation with Mr. Worthing: the suffering he has endured over the past seven years as he has waited diligently and anxiously for the day of judgment has been immense.

Mr. Worthing asks this Court consider all that he has submitted to it and sentence him in light of the full context of his actions. He respectfully requests this Court adopt the recommendation of U.S. Probation and sentence him to a non-custodial probationary term.

Dated: April 19, 2018                          Respectfully submitted,

                                               **BAY AREA CRIMINAL LAWYERS, PC**

                                               By: /s/David J. Cohen
                                               DAVID J. COHEN, ESQ.

                                               Attorneys for Defendant **Matthew Worthing**